Hat, Judge,
delivered the opinion of the court:
This is a. suit brought by the American Smelting & Be-fining Co. against the United States to recover the sum of $512,515.50. The United States has demurred to the petition.
The petition alleges that the plaintiff is a corporation organized under the laws of New Jersey, having an office in the city of New York, and that it and its officers are citizens of the United States and have at all times borne true faith and allegiance to the Government of the United States; and that it owns the claim sued on, and that no assignment or transfer of the same has been made.
The petition further alleges that for a long time preceding the declaration of war with Germany on the 6th day of April, 1917, the plaintiff company had been engaged in the production, sale, and distribution of copper, and remained so engaged after the declaration of war and up to the present time; that on the 21st day of September, 1917, the President of the United States, by virtue of the authority vested in him by the Constitution and laws of the United States, fixed the price of copper at 23-¿ cents a pound, f. o. b. New York; such price to remain in effect until the 1st day of January, 1918. On the 1st day.of January, 1918, the President of the United States entered an order fixing the same price for oopper until the 1st day of June, 1918. On the 2d day gf July, 1918, the price of copper was fixed by the President at 26 cents per pound, f. o. b. refinery, and that price remained so fixed until the date of the armistice, November 11,1918.
The petition further alleges that shortly after the price of copper was fixed by the President the copper producers of the country, at the request of the War Industries Board, formed the Copper Producers’ Committee, with an office both in New York and Washington, which committee, subject to the control of and in cooperation with the War Industries Board, distributed all orders for copper among the copper producers. This committee directed that all orders *468 for copper for the use of allied Governments should be filled through or by the plaintiff, and that all orders for copper for the United States should be filled through or by the United Metals Selling Co.
The petition further alleges that the Ordnance Department of the United States Army sent to the United Metals Selling Co. the following, dated March 14, 1918:
“That the Procurement Division is prepared to procure from you 30,000 metric tons (166,138,000 pounds) of copper, Prime Lake or Electrolytic, at a price of 23J cents net per pound, f. o. b. New York basis.”
This letter also provided for deliveries to extend over a period of six months, 5,000 metric tons per month beginning with March. The United Metals Selling Co. replied on March 19, 1918, that it could not accept the order at the price of 23-J cents per pound for deliveries extending beyond June 1, 1918, to which date only the price of 23|- cents per pound was fixed, and requested a change in the order.
The Ordnance Department on March 23, 1918, replied to the foregoing letter, amending the former letter so as to call for delivery of 30,000 metric tons of copper to be delivered on or before June 1, 1918, and on March 25, 1918, the Ordnance Department advised the United Metal Selling Co. that it wished the copper shipped to France.
The Copper Producers’ Committee directed that the copper so ordered by the Ordnance Department should be filled by the plaintiff, and on March 28, 1918, the Ordnance Department wrote a letter to the plaintiff as follows:
“That the Procurement Division is prepared to procure from you 30,000 metric tons (66,138,000 pounds) of copper at a price of 23-J cents per pound net, f. o. b. New York basis. Deliveries are to be completed on or before June 1st, 1918.”
After some intermediate correspondence the plaintiff wrote the following letter to the Ordnance Department, dated April 11, 1918:
“ We have your favor March 28, under the above reference number, and take pleasure in accepting your letter as above, pending issuance of formal contract, which we hope to receive in the near future.”
*469 The petition further alleges that the plaintiff furnished and delivered as promptly as possible upon receipt of specifications and shipping instructions all the copper for which such specifications and shipping instructions were furnished by the French High Commission and the United States, and on or before June 1,1918, had furnished and shipped a total of 10,575 metric tons, which the petition alleges was all the copper that could by any possibility have been produced and shipped by that date on the specification orders and shipping instructions then received. It also appears that the plaintiff on May 2,1918, requested to be allowed to continue deliveries beyond June 1, 1918.
The petition further alleges that on June 27, 1918, the plaintiff advised the Ordnance Department that its position was that it was entitled to full settlement on all copper delivered prior to June 1, at 23| cents a pound, and thereafter to such price as might be fixed by the Price Fixing Committee and the producers, effective upon the date so fixed. This letter was answered by the Ordnance Department July 1, 1918," and the plaintiff was advised that the department was entitled to the delivery of the entire quantity of copper at 23-£ cents a pound.
On or before July 2,1918, the plaintiff had furnished and shipped 20,701 metric tons of copper. The petition alleges that no portion of the remaining 9,299 metric tons (20,500,-620 pounds) of copper could by any degree of effort or diligence have been produced or delivered prior to July 2,1918, but the remaining quantity was produced and delivered after July 2, 1918.
On July 2, 1918, the President fixed the price of copper at 26 cents a pound, effective on that day. About the same date all questions then at issue between the producers of copper and the United States as to the price of copper to be paid under existing contracts or orders were referred to Mr. Pope Yeatman, who was authorized to act as umpire of such controversies. A hearing was held by said Pope Yeatman, at which the officers of the Ordnance Department and the officers of the plaintiff appeared. After the hearing had been closed, but before any decision had been rendered, the officers of the Ordnance Department withdrew the contro *470 versy from Mr. Pope Yeatman on the ground that there was a complete and perfect contract between the plaintiff and the United States.
On August 16,1918, the plaintiff wrote a letter to the Ordnance Department stating that it was sending to the disbursing officer in New York invoices covering shipments of copper made since July 2, 1918, at 23J cents a pound, but protesting against the payment of any less than 26 cents a pound. And the plaintiff also protested to Pope Yeatman against the action of the Ordnance Department.
It is further alleged that the Ordnance Department submitted to the plaintiff a form of contract covering the transactions above mentioned, but it was not until the 13th day of January, 1919, that the plaintiff signed the contract, which was dated March 28, 1918. The Government refused to pay the amount of money due the plaintiff until the formal contract was signed. Considerable correspondence was had between the parties between the 10th of June, 1918, and January 13, 1919, all of which correspondence appears in Exhibits P, Q, N, S, T, and U, filed with petition of the plaintiff. When the plaintiff signed the contract it filed therewith a letter, in which it protested that it was entitled to receive 26' cents a pound for all copper furnished by it after July 2, 1918, and it protested against the action of the Ordnance Department in refusing to pay 26 cents a pound for the copper so furnished, and reserved the right to take such action as it might be advised was necessary to protect its alleged rights and interests. After signing said contract the plaintiff was paid for the copper furnished by it since July 1,1918, at the rate of 23J cents a pound, which amounted to the sum of $4,817,645.70, which was $512,515.50 less than it claims should have been paid. The plaintiff under the provisions of the act of March 2, 1919, submitted its claim to the Board of Contract Adjustment. This board disallowed the claim, and its decision was approved by the Secretary of War.
Upon the foregoing facts the plaintiff claims that it is entitled to judgment against the defendants in the sum of $512,515.50 and relies upon the fifth amendment to the Con *471 stitution and section 120 of the act of June 3, 1916 (39 Stat.,213).
The defendants insist that the procurement order of March 28, 1918, and the plaintiff’s acceptance thereof constitute a contract. If this construction is correct, then the plaintiff can not rely upon section 120 of the act of June 3, 1916, nor upon the provisions of the fifth amendment to the Constitution.
It appears from the allegations of the petition that the plaintiff, upon demanding payment for the copper which it was delivering, was advised that no payment could be made by the Government until the plaintiff accepted in writing the proposal made to it by the Government. Whereupon the plaintiff on April 11, 1918, accepted the proposal of the Government to furnish and deliver 30,000 metric tons of copper at 23-J cents per pound on or before June 1, 1918. Had the procurement order of the Government been made in pursuance of the provisions of section 120 of the act of June 3, 1916, no acceptance of said order or proposal would have been necessary, nor would the Government have demanded such acceptance before making payment. Where one party makes an offer to another by letter, and the party to whom the letter is addressed prepares and mails his answer accepting the proposal, a contract is made between the parties and is binding upon them. Adams v. United States, 1 C. Cls., 192-194. The letter written by the Ordnance Department to the plaintiff was a proposal that the plaintiff should furnish and deliver a certain amount of copper at a certain price within a certain time; the acceptance of that proposal in writing by the plaintiff completed the transaction, and the proposal and acceptance together constituted a contract between the parties, and from the instant of the acceptance of the proposal there was a full and distinct accord between them. The plaintiff’s protests and reservations made when it signed the formal contract, long after the contract was completed, are of no effect. Nor could the plaintiff raise the price of the article which it was furnishing at agreed prices by complaining that the price of the article since the contract was made had advanced, even though the advanced price was fixed by one of the parties to the contract. If, the Government *472 bad fixed the price on July 2, 1918, at 20 cents instead oí 26 cents a pound we do not think the Government could successfully maintain that it should pay only 20 cents when by contract it had agreed to pay 23J cents a pound.
As we think the writings between the parties constitute a contract, it is not necessary to discuss the question raised in the petition that the procurement order of March 28,1918, was obligatory upon the plaintiff under section 120 of the act of June 3, 1916, further than to say that the so-called procurement order does not purport to be-a requisition nor to have been issued under the provisions of the act referred to. Nor has the plaintiff presented a case which entitles it to recover under the provisions of the fifth amendment to the Constitution. Nothing was taken from the plaintiff; the compensation which it received was fixed by the provisions of a contract into which it voluntarily entered.
It is difficult to understand how the plaintiff can derive any benefit from the price-fixing order of July 2, 1918. Having entered into a contract to furnish and deliver a certain article at a certain price the fixing of another price upon the article by the Government does not in any way affect the particular contract of the plaintiff. Deming v. United States, 1 C. Cls., 190, 191.
For the reasons given the demurrer of the defendants to the petition of the plaintiff is sustained and the plaintiff is granted until the 1st day of December, 1920, within which to file an amended petition in this cause.
Graham, Judge; Downey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.